J1m1jonc

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          18 Cr. 834 (PAE)

5    JAMEL JONES, KIFANO JORDAN,

6              Defendants.                 *Curcio* Hearing

7    ------------------------------x

8                                          New York, N.Y.
                                           January 22, 2019
9                                          12:08 p.m.

10

11   Before:

12                    HON. PAUL A. ENGELMAYER,

                                           District Judge
13

14                        APPEARANCES

15   GEOFFREY S. BERMAN
          United States Attorney for the
16        Southern District of New York
     BY:  MICHAEL D. LONGYEAR
17        JACOB E. WARREN
          Assistant United States Attorneys
18

19   DIANE FERRONE, ESQ., Standing in For:
     DAWN M. CARDI, ESQ.
20   CARDI & EDGAR LLP
          Attorneys for Defendant Jamel Jones
21

22   LAW OFFICES OF JEFFREY LICHTMAN
          Attorneys for Defendant Kifano Jordan
     BY:  JEFFREY B. EINHORN, ESQ.
23

24   ALSO PRESENT:  SCOTT E. LEEMON, ESQ.

25

J1m1jonc

```
 1                (Case called)
 2                MR. LONGYEAR:  Good afternoon, your Honor.  Michael
 3   Longyear and Jacob Warren on behalf of the United States.
 4                THE COURT:  Very good.  Good afternoon to both of you.
 5                And who do I have for Jamel Jones?
 6                MS. FERRONE:  Diane Ferrone standing in for Dawn
 7   Cardi.  As your Honor is aware, Ms. Cardi is CJA counsel.
 8                THE COURT:  Very good.  Good afternoon, Ms. Ferrone.
 9                And Mr. Jones, good afternoon to you.
10                MR. LEEMON:  And Scott Leemon here.
11                THE COURT:  Yes.  And Mr. Leemon, you are there as
12   well.  And you are hoping to represent Mr. Jones pending the
13   outcome of this proceeding.
14                MR. LEEMON:  Correct.
15                THE COURT:  And who do I have for Mr. Jordan?
16                MR. EINHORN:  Jeffrey Einhorn from the Law Offices of
17   Jeffrey Lichtman.  My partner is on trial, as your Honor may be
18   aware, in the Eastern District.
19                THE COURT:  Very well.  Good afternoon to you,
20   Mr. Einhorn.  And good afternoon to you, Mr. Jordan.
21                DEFENDANT JORDAN:  Good afternoon.
22                THE COURT:  And good afternoon to all of the members
23   of the public who are here.  Welcome to all of you.  Thank you
24   for being here.
25                All right.  This is a limited proceeding.  It's only
```

J1m1jonc

1    to take up a *Curcio* issue that has been taken up by the fact

2    that Mr. Leemon, who is proposing to succeed Ms. Cardi and

3    Ms. Ferrone as counsel, briefly represented Mr. Jordan.  I have

4    a series of questions that I want to put to each of the

5    defendants one by one, but before I do that, I think it makes

6    the most sense for me to take up with counsel what has happened

7    since the flurry of orders that issued about this.  What I'm

8    most eager to do is get an understanding of the communications

9    that have been had with your respective clients about the

10   potential conflict and about whether to waive it or not.  And

11   the reason is, as all are aware, sometimes in these *Curcio*

12   proceedings there's a two-step process in which first the

13   client is made aware of the potential conflict and then they're

14   given an opportunity to confer with conflict-free counsel about

15   what to do about it.  In this case, because I was given prompt

16   notice of the issue and because it was going to be a little

17   while before we could all meet, I thought it made sense for, if

18   possible, the defendants to speak with what for each of them

19   was an independent counsel already visible on the record to get

20   that guidance.

21        So let me begin with you, Ms. Ferrone.  You and

22   Ms. Cardi were appointed as CJA counsel to represent Mr. Jones

23   at the outset of this case.

24        MS. FERRONE:  That's correct, your Honor.  Ms. Cardi

25   was.  I'm of counsel to Ms. Cardi.

J1m1jonc

| | |
|---|---|
| 1 | THE COURT:  But you work with Ms. Cardi on this. |
| 2 | MS. FERRONE:  Yes.  So I have met with Mr. Jones as |
| 3 | well. |
| 4 | THE COURT:  Move the mic closer. |
| 5 | You worked with Ms. Cardi on this representation. |
| 6 | MS. FERRONE:  Yes, your Honor. |
| 7 | THE COURT:  Okay.  And the representation here that's |
| 8 | been made to me is that Mr. Leemon, for a brief period of time, |
| 9 | represented Mr. Jordan, essentially the day the case was taken |
| 10 | down, but almost immediately stepped aside in favor of |
| 11 | Mr. Einhorn.  Is that your understanding? |
| 12 | MS. FERRONE:  Yes, your Honor. |
| 13 | I'm being told no, so -- |
| 14 | THE COURT:  Sorry.  I want you to sit down, |
| 15 | Mr. Leemon.  Let me just hear from the others.  You're not yet |
| 16 | in the case, Mr. Leemon. |
| 17 | So let's get the facts.  Mr. Einhorn, what happened? |
| 18 | MR. EINHORN:  I think it's a little bit more detailed |
| 19 | than that.  I think certainly Mr. Jordan was in the process of |
| 20 | retaining us, but actually CJA counsel was appointed in the |
| 21 | meantime.  I believe it was Mr. Roth.  So Mr. Leemon was |
| 22 | initially his attorney and then Mr. Roth? |
| 23 | Okay.  So again, it was Mr. Roth at first, then |
| 24 | Mr. Leemon, then Mr. Roth again, and then he retained my firm. |
| 25 | |

J1m1jonc

| | |
|---|---|
| 1 | THE COURT:  Okay.  So Mr. Einhorn, do you have an |
| 2 | understanding of for how long it was that Mr. Leemon |
| 3 | represented Mr. Jordan? |
| 4 | MR. EINHORN:  I think technically just a few weeks, |
| 5 | your Honor, but I believe there was only two meetings about the |
| 6 | case, if that, and one of them I believe was on the day of his |
| 7 | arrest. |
| 8 | MR. LEEMON:  Yes. |
| 9 | THE COURT:  All right.  I think then, before we even |
| 10 | go any further, I need to speak with Mr. Leemon then right now, |
| 11 | because a few weeks is a radically different situation, which |
| 12 | may present a more substantial problem. |
| 13 | Mr. Leemon, give me chapter and verse -- I don't want |
| 14 | argument -- chapter and verse about your representation of |
| 15 | Mr. Jordan. |
| 16 | MR. LEEMON:  I received a call -- they were arrested |
| 17 | right before Thanksgiving.  I received a call during |
| 18 | Thanksgiving weekend -- I was down in Florida with my family -- |
| 19 | asking me to come back to represent him. |
| 20 | THE COURT:  "Him" is who? |
| 21 | MR. LEEMON:  "Him" is Mr. Jordan. |
| 22 | THE COURT:  Who did you get the call from? |
| 23 | MR. LEEMON:  One of his family members. |
| 24 | THE COURT:  Okay. |
| 25 | MR. LEEMON:  I flew back, met with Mr. Jordan on |

J1m1jonc

1    Sunday before the Monday court appearance.

2              THE COURT:  Where did you meet with Mr. Jordan?

3              MR. LEEMON:  At MCC.

4              THE COURT:  And at this point had Mr. Jordan been

5    appointed CJA counsel?

6              MR. LEEMON:  Mr. Roth had represented him at the

7    initial appearance.

8              THE COURT:  As CJA.

9              MR. LEEMON:  As CJA counsel.

10             THE COURT:  And you were being asked to come in as

11   paid counsel.

12             MR. LEEMON:  As retained counsel.

13             THE COURT:  Go ahead.

14             MR. LEEMON:  I met with him briefly that day, briefly

15   spoke generally about the indictment, explained to him what

16   would happen at the status conference the next day; I appeared

17   at the status conference the next day, and we had agreed on a

18   retainer agreement and his family was supposed to send that.  I

19   did not get it that week.  I think I met with him one other

20   time right after to ask him what's going on.  At that point I

21   was informed that his family was debating who or what to hire,

22   whether me or somebody else, and at that point I felt it

23   probably made sense for me to file a motion to be relieved.  At

24   that point I reached out to the government and told them --

25             THE COURT:  Sorry.  At this point had you had any

J1m1jonc

1    entreaty on behalf of Mr. Jones?  Had anyone from Mr. Jones
2    reached out to you at this point?

3              MR. LEEMON:  No.

4              THE COURT:  All right.  So in other words, at the time
5    you're proposing to move to be relieved, you would have been
6    absent from the case; there had been no suggestion to you that
7    Mr. Jones might be interested in your services.

8              MR. LEEMON:  Well, and then in between that time and
9    me actually filing the motion, I received a call from one of
10   Mr. Jones's family asking me if I could come into the case.  At
11   that point I reached out to the government and told the
12   government that I had this inquiry and I was waiting to see
13   what happened with Mr. Jordan, I was hoping Mr. Jordan was
14   going to hire new counsel in between and it would have been an
15   easy move, new counsel comes in, I get out, and then I could
16   see what happens with the Joneses.  I didn't know what was
17   going to happen.  At that point I didn't hear anything from the
18   Jones family until after the new year.

19             THE COURT:  So you don't know whether or not the Jones
20   family is interested in your representation.

21             MR. LEEMON:  At that point.

22             THE COURT:  He's continued to be represented by
23   Ms. Cardi and Ms. Ferrone.

24             MR. LEEMON:  Correct.

25             THE COURT:  And what's going on, though, with respect

1    to the Jordan representation?

2                    MR. LEEMON:  At that point I still had not filed my

3    motion to be relieved.  I waited to see if new counsel was

4    hired.  I then received an email from the government in mid to

5    late December saying, make a decision, we need to figure out

6    what's going on.  At that point I filed the motion to be

7    relieved.

8                    THE COURT:  And Mr. Roth had briefly represented

9    Mr. Jordan just for the purposes of the initial conference, but

10   you have appeared at this point soon thereafter for Mr. Jordan.

11                   MR. LEEMON:  Correct.

12                   THE COURT:  So Mr. Roth is out at that point.

13                   MR. LEEMON:  He's out.  I filed the motion to be

14   relieved.  And after the reappointment to Roth -- because

15   Mr. Jordan at that time had not figured out what he was doing

16   and no one had entered an appearance on his behalf.  So I told

17   him, Mr. Roth had already been appointed; if there was going to

18   be a lapse, let him represent him during that lapse.

19                   THE COURT:  And I grant that motion.

20                   MR. LEEMON:  Correct.

21                   THE COURT:  And so just give me the brackets of your

22   representation dates of Mr. Jordan.  What date to what date?

23                   MR. LEEMON:  Technically it was -- the initial court

24   appearance was November 26, and I believe sometime in mid to

25   late November, or December, is when I moved to be relieved.  I

J1m1jonc

1  don't have the exact date.

2              THE COURT:  So approximately a month.

3              MR. LEEMON:  Approximately a month.

4              THE COURT:  And how many times during that month,

5  first of all, did you meet in person with your client?

6              MR. LEEMON:  I think three.

7              THE COURT:  Tell me about those.

8              MR. LEEMON:  First one was to discuss generally what's

9  going on.

10             THE COURT:  That's at the MCC.

11             MR. LEEMON:  At the MCC.  All the meetings were at the

12 MCC.

13             THE COURT:  But that's before the initial conference.

14             MR. LEEMON:  That's before.  I met with him then

15 shortly after, worked out the details, explained what happened.

16             THE COURT:  Too blurry.  You need to be --

17             MR. LEEMON:  Sorry.  Shortly after the status

18 conference on the 26th, I would guess sometime that week.

19             THE COURT:  When you say, we met about the details and

20 what happened, you need to be --

21             MR. LEEMON:  I explained what happened at the status

22 conference and I told him, we need to see the discovery, once

23 we have the discovery, we'll be able to have substantive talks

24 about the case against you.

25             THE COURT:  And what's the third meeting?

J1m1jonc

1          MR. LEEMON:  The third meeting was, I haven't heard

2     back from the family what's going on.

3          THE COURT:  That's also in person?

4          MR. LEEMON:  In person.

5          THE COURT:  Other than the in-person meetings, did you

6     have any electronic communications or phone communications with

7     Mr. Jordan?

8          MR. LEEMON:  I do not believe so, no.  I was not on

9     his email list.

10          THE COURT:  All right.  In any of those three meetings

11     did Mr. Jordan say anything to you -- and I don't want the

12     content, but did Mr. Jordan say anything to you about the facts

13     of this case?

14          MR. LEEMON:  Nothing substantive; just general

15     conversation about the case.

16          THE COURT:  Did he say anything to you about

17     Mr. Jones?

18          MR. LEEMON:  I told him that the Jones family had

19     reached out to me at one point.

20          THE COURT:  I'm actually more interested in the facts

21     of the case.  Did he say anything to you about --

22          MR. LEEMON:  No.

23          THE COURT:  -- who Mr. Jones was or any relationship

24     he had with Mr. Jones?

25          MR. LEEMON:  Nothing specific, no.

J1m1jonc

1          THE COURT:  What about anything in general?

2          MR. LEEMON:  Just he's part of the case against us.

3    Just talking about --

4          THE COURT:  He's part of the case against us?

5          MR. LEEMON:  I'm sorry.  We did have one discussion,

6    just asking what everyone's role, who's been indicted, how he

7    knew them.

8          THE COURT:  Okay.  So you asked him how he knew

9    Mr. Jones?

10          MR. LEEMON:  Correct.

11          THE COURT:  And without telling me his answer, he

12    answered that question to you?

13          MR. LEEMON:  He did.

14          THE COURT:  At what length did his answer go?

15          MR. LEEMON:  General.

16          THE COURT:  Less than ten words?

17          MR. LEEMON:  Yes.

18          THE COURT:  Other than that, did Mr. Jones's name, in

19    your memory, come up at all in your communications with

20    Mr. Jordan?

21          MR. LEEMON:  No.

22          THE COURT:  Did you review any discovery that was

23    particular to Mr. Jordan?

24          MR. LEEMON:  Absolutely not, and I have provided

25    Mr. Einhorn with the DVDs that were turned over.  I never even

J1m1jonc

1    downloaded them.

2                THE COURT:  Okay.

3                MR. EINHORN:  We'll acknowledge receipt, your Honor.

4    We did receive them.

5                THE COURT:  All right.  Mr. Leemon, anything else

6    factual to proffer to me?

7                MR. LEEMON:  I don't think there's anything else.

8                THE COURT:  And you of course have not commenced your

9    representation of Mr. Jones because you haven't been --

10                MR. LEEMON:  Officially appointed.

11                THE COURT:  -- officially appointed, and you've held

12    off reviewing Jones's discovery or counseling Mr. Jones or his

13    family pending your appointment, is that correct?

14                MR. LEEMON:  I have not offered anything of substance.

15    I had a couple of meetings with him.  We did not discuss

16    anything, except for the fact we were going to appear here,

17    your Honor.

18                THE COURT:  So the only discussions you've had with

19    him have involved the conflict issue, correct?

20                MR. LEEMON:  Correct, and told him that initially,

21    before you issued that order, I had an appointment with the

22    government to go over the discovery, and we stopped that

23    pending the resolution of the --

24                THE COURT:  For future reference, I shouldn't have had

25    to issue that order.  If there's a *Curcio* issue, you need to

J1m1jonc

```
1    stop work.  You need to not start work pending the appointment.
2    Otherwise there's a risk of soiling the nest for everybody if a
3    conflicted lawyer is rooting around doing stuff without court
4    approval.  So for future reference, in federal court, these
5    niceties really matter.  So I'm glad you didn't do any work,
6    but I shouldn't have had to tell you that, okay?
7              MR. LEEMON:  All right.
8              THE COURT:  So with that, let's go back then to you,
9    Ms. Ferrone.  Does Mr. Leemon's account of the facts align with
10   what your understanding had been coming into this hearing?
11             MS. FERRONE:  Yes, that's correct, your Honor.  I
12   think that after your Honor issued the order on January 11th of
13   2019, Ms. Cardi visited in person at the MCC with Mr. Jones on
14   the following day, January 12th, the Saturday, where they
15   discussed the potential for conflict, Mr. Leemon's brief
16   representation of Mr. Jordan, and Mr. Jones indicated that to
17   the extent there was a conflict, he was willing to waive it and
18   go forward with Mr. Leemon.
19             THE COURT:  Okay.  Were you present for that meeting?
20             MS. FERRONE:  I was not, your Honor.
21             THE COURT:  Have you had any meetings with your
22   client, Mr. Jones, about the Curcio issue?
23             MS. FERRONE:  I have not, your Honor.
24             THE COURT:  In what detail did Ms. Cardi recount to
25   you -- I understand she's unavailable, and I authorized your
```

J1m1jonc

standing in for her, but I want to make sure that you're in a

position to proffer to me about Ms. Cardi's meetings with your

client.

MS. FERRONE:  Other than that one meeting on

January 12th, which she provided the details of to me, in broad

strokes, that's the extent of which I can inform the Court.

THE COURT:  Did she convey to you that she felt that

Mr. Jones understood the nature of the potential conflict?

MS. FERRONE:  Yes, she did.

THE COURT:  Did she convey to you that Mr. Jones

understood that he had a right to decline to agree to proceed

with counsel who harbored a potential conflict?

MS. FERRONE:  Yes.

THE COURT:  Did she feel that Mr. Jones got it, that

he understood the nature of the conflict and the right that he

had not to proceed with anything other than a conflict-free

counsel?

MS. FERRONE:  Yes.

THE COURT:  All right.  And Ms. Cardi is obviously

well known to me as a very respected member of the CJA panel.

Her word counts a lot.  She was unequivocal in so representing

all that to you?

MS. FERRONE:  Yes, very much so, your Honor.

THE COURT:  All right.  Very good.  Let's turn then to

Mr. Einhorn, as to your conversations with Mr. Jordan.  Before

J1m1jonc

```
1   I ask you about that, does Mr. Leemon's account of the facts
2   align with your understanding about what his representation had
3   been of what is now your client, Mr. Jordan?
4           MR. EINHORN:  Yes, your Honor.  It aligns with my
5   understanding of the situation that occurred.
6           THE COURT:  And how do you come in for Mr. Roth?  In
7   other words, as I understand it, Mr. Roth is there at the
8   initial conference, Mr. Leemon takes over for a month or so,
9   Mr. Leemon withdraws, I appointed Mr. Roth.  How did you get
10  into this situation?
11          MR. EINHORN:  I think I can make it somewhat simple.
12  We were initially contacted about Mr. Jordan's arrest sometime
13  in -- I believe it was the beginning of December, and spoke
14  with the family about potentially coming into the case.  And it
15  took the family some time to be able to retain us.  We had met
16  with Mr. Jordan twice at that time but were not coming into the
17  case until they were able to retain us.  We didn't actually
18  hear back from them for some time, and then were not firmly
19  retained by them until just last week, at which point I went to
20  see Mr. Jordan and we discussed the Curcio issue and any
21  potential conflict that may exist.
22          THE COURT:  All right.  So you were retained last
23  week, substituting Mr. Roth.
24          MR. EINHORN:  That's correct.
25          THE COURT:  The lawyer who conferred with Mr. Jordan,
```

J1m1jonc

| | |
|---|---|
| 1 | the independent lawyer with respect to the *Curcio* issue, was |
| 2 | Mr. Roth or you or both? |
| 3 | MR. EINHORN:  It was me, your Honor, but I believe |
| 4 | Mr. Roth also counseled Mr. Jordan, and we discussed the |
| 5 | situation and his understanding from what Mr. Jordan wants to |
| 6 | do and what occurred were aligned. |
| 7 | THE COURT:  So let's talk about your conversations |
| 8 | with Mr. Jordan.  To begin with, what I think you just |
| 9 | indicated is that what Mr. Leemon described aligns with what |
| 10 | you understood the facts to be at the time you met with your |
| 11 | client? |
| 12 | MR. EINHORN:  That's correct, your Honor. |
| 13 | THE COURT:  How much time did you spend with |
| 14 | Mr. Jordan discussing the *Curcio* situation and his rights? |
| 15 | MR. EINHORN:  I would say approximately one hour. |
| 16 | THE COURT:  And when was that? |
| 17 | MR. EINHORN:  This past Thursday. |
| 18 | THE COURT:  Okay.  And tell me more about that |
| 19 | conversation. |
| 20 | MR. EINHORN:  We discussed any potential conflict of |
| 21 | interest that may exist with regard to Mr. Leemon's previous |
| 22 | representation of Mr. Jordan, we discussed the contents of |
| 23 | their meetings, the number of meetings, the length of their |
| 24 | meetings, and what, if any, details were discussed concerning |
| 25 | Mr. Jones or anybody else. |

J1m1jonc

1          THE COURT:  Were you left with the same understanding

2     that Mr. Leemon conveyed, that essentially there was nothing of

3     substance that Mr. Jordan conveyed to Mr. Leemon either

4     generally about the case or specifically about Mr. Jones?

5          MR. EINHORN:  That's correct, your Honor.  That's my

6     understanding as well.

7          THE COURT:  Mr. Leemon represented that he recalls a

8     very short back-and-forth along the lines of who's Mr. Jones

9     and Mr. Jordan gave an answer that, in response to my question,

10    Mr. Leemon feels is unlikely to be more than ten words.  Is

11    that in line with the understanding you took away from your

12    client?

13         MR. EINHORN:  That's my takeaway as well, your Honor.

14         THE COURT:  All right.  And in your view, did

15    Mr. Jordan understand that he has a right to conflict-free

16    counsel, he can insist on Mr. Leemon not taking over the Jones

17    representation?

18         MR. EINHORN:  He understands that, and he indicated to

19    me that he would waive for these purposes today.

20         THE COURT:  All right.  And you're confident he

21    understood his rights.

22         MR. EINHORN:  Yes, your Honor.

23         THE COURT:  All right.  Government, before I take up

24    questions going one by one with the two defendants, is there

25    any additional background, in the interest of protecting the

J1m1jonc

record here, making sure that we have a satisfactory *Curcio*

examination, any of the background you want me to try to elicit

about the facts?

MR. LONGYEAR:  No, your Honor.  But to clarify just

briefly about Mr. Roth's involvement --

THE COURT:  Right.

MR. LONGYEAR:  -- on November 19th was the initial

presentment, and at that point Judge Pitman, upon reviewing the

financial affidavit from Mr. Jordan, determined that he was not

eligible for CJA and therefore appointed Mr. Roth for

presentment only.

THE COURT:  I see.  So he was going to have to get

substituted.

MR. LONGYEAR:  That's correct.  So that's the 19th.

I think on the 25th then Mr. Leemon comes in and is in

for the 26th, the conference was on November 26th, and then I

believe your Honor, I want to say it was around December 23rd,

somewhere around then is when your Honor signed, so ordered

Mr. Leemon's letter requesting that he be relieved, and at that

point was when Mr. Roth was then appointed for Mr. Jordan.  So

I don't want to speak to Mr. Roth because he and I haven't had

substantive conversations about what was discussed, but I just

want to make clear that Mr. Roth technically wasn't

representing Mr. Jordan.  He was only appointed at that initial

presentment.

J1m1jonc

1          THE COURT:  Understood.  All right.  Thank you.  Very

2     helpful.

3          Let me just come back to you, Mr. Einhorn.  I covered

4     your discussions with Mr. Jordan.  Did Mr. Roth make any

5     representations to you about his discussions with Mr. Jordan

6     about the *Curcio* issue?

7          MR. EINHORN:  He indicated to me that they discussed

8     the issue and they had gone back and forth on it, and his

9     takeaway was similar to mine and similar to Mr. Leemon's as

10    well.

11         THE COURT:  All right.  Okay.  Very good.

12         If nobody has any additional questions, I'm going to

13    proceed to question first Mr. Jones.  But Mr. Jordan, I will

14    ask you to play close attention because some of the questions

15    that I ask Mr. Jones will be similar, so it will help you get

16    up to speed.

17         Mr. Smallman, will you kindly swear Mr. Jones.

18         (Defendant Jones sworn)

19         THE COURT:  All right.  Mr. Jones, how old are you?

20         DEFENDANT JONES:  Thirty-eight.

21         THE COURT:  You can sit down.  It's fine with me.

22    Just speak into the mic so everyone can hear you.

23         What education have you received?

24         DEFENDANT JONES:  Twelfth grade.

25         THE COURT:  Where was that?

J1m1jonc

1           DEFENDANT JONES:  John Jay High School.

2           THE COURT:  All right.  And are you currently under a

3    doctor's care or taking any medication?

4           DEFENDANT JONES:  No, sir.

5           THE COURT:  No?

6           DEFENDANT JONES:  No, sir.

7           THE COURT:  All right.  Very good.

8           In the past 24 hours have you taken any drugs,

9    alcohol, or anything that could impair your ability to

10   understand?

11          DEFENDANT JONES:  No, sir.

12          THE COURT:  Is there anything today that's interfering

13   with your ability to understand what's happening?

14          DEFENDANT JONES:  No, sir.

15          THE COURT:  Your mind is clear?

16          DEFENDANT JONES:  Yes.

17          THE COURT:  Okay.  And Mr. Leemon, is it your view

18   that Mr. Jones is of a clear mind today?

19          MR. LEEMON:  Absolutely.  I met with him before court

20   and he's clear.

21          THE COURT:  And Ms. Ferrone, same?

22          MS. FERRONE:  Yes, your Honor.

23          THE COURT:  All right.  Mr. Jones, to the extent you

24   had conversations with Mr. Leemon, are you satisfied with his

25   work and services so far?

J1m1jonc

1          DEFENDANT JONES:  Yes, sir.

2          THE COURT:  Has Mr. Leemon in fact informed you that

3    at one point he represented your co-defendant Mr. Jordan?

4          DEFENDANT JONES:  Yes, sir.

5          THE COURT:  Do you understand that the fact that

6    Mr. Leemon at one point represented Mr. Jordan and had

7    conversations of some sort with him that are likely covered by

8    attorney-client privilege, that those could lead Mr. Leemon in

9    some circumstance to have divided loyalties between you and

10   Mr. Jordan?

11         DEFENDANT JONES:  Yes, sir.

12         THE COURT:  And let me give you some examples of ways,

13   at least in theory, that Mr. Leemon's privileged conversations

14   with Mr. Jordan could adversely affect his representation of

15   you.  And let me make something clear.

16         Mr. Leemon, please don't pass that notepad.  You're

17   not even counsel yet.  If you're passing notes, why don't you

18   sit in back.  You're not his counsel yet, and I can't tell you

19   how offensive it is that I'm in the middle of a *Curcio* hearing

20   and the lawyer who's subject to the conflict is passing notes

21   to the client.  Go sit in the back.  I'm sorry.  But, you know,

22   this is federal court.

23         Ms. Ferrone, why don't you go sit next to your client.

24         MS. FERRONE:  Sure.

25         THE COURT:  Look, Mr. Jones, I'm not in any way

J1m1jonc

1   representing to you that in point of fact any of these conflict

2   issues could come home to roost.  My job is just to make sure

3   you're aware of the possibilities.  I've certainly heard what

4   Mr. Leemon represented, and if it's as described, it sounds

5   very likely like a nonissue, but it's possible there's more

6   there than any of us remember, that he remembers, and so I need

7   to ask you these questions.  Don't infer from my questions that

8   I'm making a judgment that there is a problem here.  I'm simply

9   being neutral in describing a few possibilities.  Do you

10   understand that?

11            DEFENDANT JONES:  Yes, sir.

12            THE COURT:  All right.  So Mr. Jones, these are ways

13   in which Mr. Leemon's privileged conversations with Mr. Jordan

14   could potentially adversely affect his representation of you.

15            First of all, are you aware that Mr. Leemon could

16   possibly have information from Mr. Jordan that would be helpful

17   in defending you but that he would be absolutely prohibited

18   from using it to defend you because of the attorney-client

19   privilege?

20            DEFENDANT JONES:  Yes, sir.

21            THE COURT:  Similarly, do you understand that were

22   this case to proceed to trial, and if Mr. Jordan were to

23   testify, Mr. Leemon might have information to cross-examine

24   Mr. Jordan but he would be prohibited from using it because

25   it's protected by the attorney-client privilege?  Do you

J1m1jonc

1  understand that?

2      DEFENDANT JONES:  Yes, sir.

3      THE COURT:  All right.  I need to make sure you

4  understand in your own words what the potential conflict is

5  here.  Can you put it in your own words to me?

6      DEFENDANT JONES:  Maybe -- like maybe when they spoke,

7  that whatever, whatever information that he -- that he got from

8  Kifano Jones, that he can't use to help me down the line.

9      THE COURT:  Okay.  All right.  And do you understand

10  that apart from what you've just described, apart from the two

11  situations that I've described, one danger is that we may not

12  be able to foresee all the possible conflicts here; in other

13  words, there's a possibility that there may be some other

14  conflict that none of us can quite imagine right now that

15  arises because Mr. Leemon had privileged conversations with

16  Mr. Jordan and they might in some way limit his ability to

17  represent you?  Do you understand there's a possibility that

18  there's something else out there that none of us have spotted?

19      DEFENDANT JONES:  Yes, sir.

20      THE COURT:  Okay.  And do you understand that in every

21  criminal case, including yours, a defendant is entitled to

22  assistance of counsel whose loyalty to him is undivided, who's

23  not subject to any factor that might in any way intrude upon an

24  attorney's loyalty to his interests?

25      DEFENDANT JONES:  Yes, sir.

J1m1jonc

1          THE COURT:  And in other words, do you understand that

2     you are entitled to an attorney who has your interests alone,

3     only your interests in mind and not the interests of anyone

4     else, not the interests of any other client?

5          DEFENDANT JONES:  Yes, I do.

6          THE COURT:  That's your right; you understand that.

7          DEFENDANT JONES:  Yes, sir.

8          THE COURT:  Has anyone given you any inducement or any

9     promise or any threat with respect to your choice of counsel?

10          DEFENDANT JONES:  No, sir.

11          THE COURT:  Have you consulted with any attorneys

12     other than Mr. Leemon, such as Ms. Cardi, about the issues

13     presented by this potential conflict of interest?

14          DEFENDANT JONES:  You say any other lawyer?

15          THE COURT:  Yes.  Like did you speak with Ms. Cardi?

16          DEFENDANT JONES:  Yes, sir.

17          THE COURT:  How long did you spend with Ms. Cardi on

18     this subject?

19          DEFENDANT JONES:  About 30, 40 minutes.

20          THE COURT:  Okay.  And do you feel, coming away from

21     that conversation, you understood the potential conflict of

22     interest here?

23          DEFENDANT JONES:  Yes, sir.

24          THE COURT:  All right.  And do you understand that you

25     had a right to confer with Ms. Cardi about that and if you want

1    more time, I'll give you an opportunity to speak again with her

2    or with Ms. Ferrone, if there's any aspects of the information

3    that I've conveyed to you today that you want to discuss with

4    an attorney who is free of a conflict?  Do you understand that?

5            DEFENDANT JONES:  Yes, sir.

6            THE COURT:  All right.  I'm prepared, if you want, to

7    adjourn the rest of this proceeding as to you if you'd like

8    more time to consult with an attorney about the potential

9    conflict of interests that I've described, and if it were to

10   turn out that you couldn't afford a lawyer to consult with, I

11   would be glad to appoint somebody.  I think realistically, I

12   would ask Ms. Cardi to continue on, and Ms. Ferrone, because

13   they're as able as anyone to handle this.  But the point is

14   that I would give you more time to speak with them if you'd

15   like.  Would you prefer to adjourn so you can give more time or

16   thought to this matter, or are you prepared to decide now?

17           DEFENDANT JONES:  I'm prepared to decide now.

18           THE COURT:  All right.  After considering everything

19   I've said to you about the ways in which Mr. Leemon's prior

20   representation of Mr. Jordan may adversely affect your defense,

21   do you believe that it's in your best interests to continue

22   with him as your attorney?

23           DEFENDANT JONES:  Yes, sir.

24           THE COURT:  All right.  And more precisely, do you

25   want me to appoint him, to authorize his substitution as your

J1m1jonc

```
1    attorney?  I don't need to appoint him.  He's a retained

2    counsel.  But I need to clear his representation as against the

3    potential conflict.  It is your wish that I do so.

4              DEFENDANT JONES:  Yes, sir.

5              THE COURT:  All right.  And do you understand that by

6    choosing to have Mr. Leemon as your attorney, you're waiving

7    your right to be represented solely by an attorney who has no

8    conflict of interest?

9              DEFENDANT JONES:  Yes, sir.

10             THE COURT:  All right.  And you're knowingly and

11   voluntarily waiving your right to conflict-free representation?

12             DEFENDANT JONES:  Yes, sir.

13             THE COURT:  And do you agree to waive any

14   postconviction argument -- meaning if you're convicted at a

15   trial in this case, do you agree to waive any postconviction

16   argument, on appeal or otherwise, that by virtue of

17   Mr. Leemon's prior representation of Mr. Jordan and his

18   representation now of you, you were denied effective assistance

19   of counsel by Mr. Leemon?  You agree to forgo that argument?

20             DEFENDANT JONES:  Yes, sir.

21             THE COURT:  All right.  Is there anything that I've

22   said that you wish to have explained further?

23             DEFENDANT JONES:  No, sir.

24             THE COURT:  All right.  I have listened closely to

25   Mr. Jones, and I am firmly persuaded that he understands his
```

J1m1jonc

1    right to conflict-free counsel and has knowingly and

2    voluntarily waived it.

3          We now need to take up the same issues with

4    Mr. Jordan, but I certainly am persuaded that there is a

5    satisfactory waiver here as it relates to Mr. Jones.

6          I should ask the government whether you have any

7    different view.

8          MR. LONGYEAR:  No, your Honor.

9          THE COURT:  All right.  And counsel, I take it you're

10   in agreement as well.

11         MS. FERRONE:  Yes, your Honor.

12         THE COURT:  Okay.  Then let's turn to Mr. Jordan.

13         Mr. Smallman, would you kindly swear Mr. Jordan.

14         (Defendant Jordan sworn)

15         THE COURT:  All right.  You may be seated.

16         Mr. Jordan, how old are you?

17         DEFENDANT JORDAN:  I'm 36 years old, your Honor.

18         THE COURT:  And what education have you received?

19         DEFENDANT JORDAN:  High school education.

20         THE COURT:  Where was that?

21         DEFENDANT JORDAN:  George Westinghouse High School.

22         THE COURT:  Where is that?

23         DEFENDANT JORDAN:  In Brooklyn.

24         THE COURT:  Okay.  And are you currently taking any

25   medication or under a doctor's care?

J1m1jonc

1        DEFENDANT JORDAN:  No, your Honor.

2        THE COURT:  In the past 24 hours have you taken any

3   alcohol, had any alcohol or drugs or taken anything that could

4   impair your ability to understand or make yourself heard?

5        DEFENDANT JORDAN:  No, your Honor.

6        THE COURT:  Is your mind clear today?

7        DEFENDANT JORDAN:  Yes, sir, your Honor.

8        THE COURT:  Anything interfering with your ability to

9   understand what's happening here today?

10        DEFENDANT JORDAN:  No, your Honor.

11        THE COURT:  And Mr. Einhorn, are you satisfied that

12   your client is of a clear mind today?

13        MR. EINHORN:  I am, your Honor.

14        THE COURT:  All right.  Mr. Jordan, do you understand

15   that the fact that Mr. Leemon once represented you and likely

16   had conversations with you that are covered by the

17   attorney-client privilege, that all that could lead to divided

18   loyalty by Mr. Leemon as between you and Mr. Jones if he takes

19   on the representation of Mr. Jones?

20        DEFENDANT JORDAN:  Yes, your Honor.

21        THE COURT:  Do you understand that were the case to

22   proceed to trial, and you testified at trial, Mr. Leemon could

23   potentially cross-examine you and, in the process, in some way

24   potentially exploit confidences that he learned from you during

25   his representation of you?

J1m1jonc

1          DEFENDANT JORDAN:  Yes, your Honor.

2          THE COURT:  And tell me in your own words what your

3     understanding is of the potential conflict of interest that

4     would occur if Mr. Leemon is allowed now to represent

5     Mr. Jones.

6          DEFENDANT JORDAN:  If we did have any conversations

7     about the case prior to him representing Mr. Jones, that it

8     could affect us at trial, somewhere down the line.

9          THE COURT:  In what way?

10          DEFENDANT JORDAN:  Either in a negative or positive

11    way.

12          THE COURT:  Right.  But in other words, just

13    concretely, just explain to me how that could hurt you.  Like

14    in what potential way?  How could it hurt you?

15          DEFENDANT JORDAN:  If me and him spoke in any way, he

16    might be able to bring it up in open court, cross-examine me,

17    whatever.

18          THE COURT:  Okay.  Same questions I asked Mr. Jones.

19    Do you understand in every criminal case, including yours, the

20    defendant is entitled to assistance of counsel whose loyalty to

21    him is undivided, who is not subject to any factor that might

22    in any way intrude upon an attorney's loyalty to his interests?

23          DEFENDANT JORDAN:  Yes, I understand.

24          THE COURT:  You understand that you're entitled to

25    have an attorney who has only your interests in mind and not

J1m1jonc

1  the interests of any other client.

2          DEFENDANT JORDAN:  Yes, your Honor.

3          THE COURT:  All right.  And have you received any

4  inducement, promise, or threat with regard to your decision

5  whether or not to waive the right to conflict-free counsel so

6  as to help allow Mr. Leemon to represent Mr. Jones?

7          DEFENDANT JORDAN:  No, your Honor.

8          THE COURT:  All right.  Have you consulted with

9  independent counsel, somebody other than Mr. Leemon, about the

10  dangers to you presented by the potential conflict of interest?

11          DEFENDANT JORDAN:  Yes, I have, your Honor.

12          THE COURT:  Who have you consulted with?

13          DEFENDANT JORDAN:  Mr. Einhorn and Mr. Roth.

14          THE COURT:  Do you feel you spent enough time with

15  them to understand your rights here?

16          DEFENDANT JORDAN:  Yes, your Honor.

17          THE COURT:  About how much time did you spend with

18  each of them?

19          DEFENDANT JORDAN:  Combined, maybe over -- about an

20  hour and 40 minutes combined.

21          THE COURT:  Okay.  And do you understand that you have

22  a right to do just that, you have a right to consult with

23  attorneys who don't have any conflict of interest, and that

24  I'll give you an opportunity to continue those conversations if

25  there's anything that you want to follow up with?  Do you

J1m1jonc

1      understand that?

2              DEFENDANT JORDAN:  Yes, I do, your Honor.

3              THE COURT:  All right.  And I'm prepared to adjourn

4      the remainder of this proceeding so that you can continue your

5      conversation with Mr. Einhorn, or if you wanted to go back to

6      see Mr. Roth, I'm happy for you to do that if you'd like to.

7      Would you prefer that I adjourn until you can give more thought

8      to this matter, or are you prepared to decide today?

9              DEFENDANT JORDAN:  I'm prepared to decide today, your

10     Honor.

11             THE COURT:  All right.  And are you knowingly and

12     voluntarily waiving your right to conflict-free representation?

13             DEFENDANT JORDAN:  Yes, I am, your Honor.

14             THE COURT:  And do you agree to waive any

15     postconviction argument, on appeal or otherwise, that by virtue

16     of Mr. Leemon's earlier representation of you and his upcoming

17     representation of Mr. Jones, that you were denied effective

18     assistance of counsel?

19             DEFENDANT JORDAN:  Yes, I do, your Honor.

20             THE COURT:  All right.  Is there anything that I have

21     said that you'd like to have explained further?

22             DEFENDANT JORDAN:  No, sir.

23             THE COURT:  All right.  Government counsel, do you

24     disagree that Mr. Jordan has given a knowing and voluntary

25     waiver of his right to conflict-free counsel?

J1m1jonc

| | |
|---|---|
| 1 | MR. LONGYEAR:  No, we do not disagree. |
| 2 | THE COURT:  Defense counsel, any disagreement? |
| 3 | MR. EINHORN:  No disagreement, your Honor. |
| 4 | THE COURT:  As with Mr. Jones, I find that Mr. Jordan |
| 5 | has knowingly and voluntarily waived his right to conflict-free |
| 6 | counsel.  So with that, I will authorize Mr. Leemon's |
| 7 | representation, effective immediately, of Mr. Jones.  I find |
| 8 | that both defendants have knowingly and voluntarily waived |
| 9 | their right to conflict-free counsel. |
| 10 | Ms. Ferrone, I take it that means that you and |
| 11 | Ms. Cardi are, effectively immediately, relieved. |
| 12 | MS. FERRONE:  Yes, your Honor.  We'll not be at the |
| 13 | 2 p.m. conference. |
| 14 | THE COURT:  No.  I believe it's 2:30. |
| 15 | MS. FERRONE:  2:30, right. |
| 16 | THE COURT:  Yes.  And will you please make sure, on |
| 17 | behalf of yourself and Ms. Cardi, to promptly effect a full |
| 18 | knowledge transfer to Mr. Leemon.  You've been at this case now |
| 19 | since mid/late November.  To the extent you have discovery, to |
| 20 | the extent you have interviews, to the extent you have work |
| 21 | product, please promptly make it available to Mr. Leemon so |
| 22 | that he can hit the ground running. |
| 23 | MS. FERRONE:  Absolutely, your Honor. |
| 24 | THE COURT:  All right.  And government, would you |
| 25 | please make sure that Mr. Leemon has whatever discovery letters |

J1m1jonc

| | |
|---|---|
| 1 | or other correspondence you've issued so that he is in a |
| 2 | position to determine that he is in fact in possession of all |
| 3 | correspondence and Rule 16 discovery from the government. |
| 4 | MR. LONGYEAR:  Yes, your Honor, and one point on that. |
| 5 | There is a protective order in this case.  Mr. Leemon had |
| 6 | signed it on behalf of Mr. Jordan.  Mr. Einhorn and |
| 7 | Mr. Lichtman are now in for Mr. Jordan.  So I guess my question |
| 8 | for your Honor is, how would you like us to address that |
| 9 | protective order?  Is it enough that they're aware of it and -- |
| 10 | THE COURT:  I think they ought to sign it, but just so |
| 11 | Mr. Leemon may now get in on the case, Mr. Leemon may now come |
| 12 | forward. |
| 13 | Mr. Leemon, do you understand that the protective |
| 14 | order that you once issued as to Mr. Jordan equally applies to |
| 15 | you in your representation of Mr. Jones? |
| 16 | MR. LEEMON:  I do. |
| 17 | THE COURT:  I'll ask you, when the government gets you |
| 18 | the new version, to sign it, but so that you can get out of the |
| 19 | gate quickly without delay, do you understand that per this |
| 20 | conversation, you're bound by those same terms in your |
| 21 | representation of Mr. Jones? |
| 22 | MR. LEEMON:  I do. |
| 23 | THE COURT:  All right.  Very good. |
| 24 | All right.  Before we break, Mr. Leemon, am I correct |
| 25 | that you disrupted your travel plans to come here today? |

J1m1jonc

1          MR. LEEMON:  I did.

2          THE COURT:  Where were you going?

3          MR. LEEMON:  I was supposed to be in Jamaica, your

4  Honor.

5          THE COURT:  All right.  I want to just give a shoutout

6  to you, because while I was a little tart with you a moment ago

7  for passing notes with your future client during a colloquy;

8  it's also the case that you did something very noble, which is

9  to disrupt your own travel plans to get here so that you could

10  start your representation earlier.  I have great respect for

11  that.  I hope it didn't inconvenience you and your family too

12  much, but I'm grateful for your dedication to Mr. Jones that

13  you did that.

14          Mr. Jones, you have a dedicated lawyer.

15          Yes.

16          MR. EINHORN:  Judge, just one more thing before we

17  break, before the 2:30.  I was only recently informed of this,

18  but there actually is another *Curcio* issue that's not been

19  explored as of yet, and that is that Mr. Hernandez, who has

20  Mr. Lazzaro as his attorney, previously represented my client,

21  actually at trial once and I believe in two other cases as

22  well.  I wanted to get that before the Court.

23          THE COURT:  That was at a trial?

24          MR. EINHORN:  At a trial.  He was his lawyer at a

25  trial, I believe in Brooklyn?

J1m1jonc

1          DEFENDANT JORDAN:  Yes, sir.

2          MR. EINHORN:  I was only briefly made aware of it.  I

3    wanted to get it before the Court as soon as possible.

4          THE COURT:  When did you become aware of this?

5          MR. EINHORN:  Just on Thursday, Judge, when I met with

6    Mr. Jordan.

7          THE COURT:  Is there some reason why I'm learning of

8    this now as opposed to later on Thursday?

9          MR. EINHORN:  Your Honor, I left the state after I met

10   with Mr. Jordan.

11         THE COURT:  No, but the internet didn't leave you.  Is

12   there some reason you didn't tell the government or find a way

13   to alert my chambers?  For heaven's sake, that's five days ago.

14   It would have been better for all of us to know it.

15         MR. EINHORN:  I apologize to the Court, your Honor.  I

16   did want the opportunity to discuss the matter again with

17   Mr. Jordan to find out exactly the details.  He couldn't

18   remember everything.  We did sit here, we talked about it

19   before your Honor came out again, but there is certainly an

20   issue.

21         THE COURT:  Mr. Hernandez represented Mr. Jordan at

22   some point.

23         MR. EINHORN:  No, no, no, no, no.  Mr. Lazzaro

24   represented.

25         THE COURT:  I'm sorry.  Mr. Lazzaro.  Right.

J1m1jonc

1   Mr. Lazzaro, who is the current lawyer for --

2            MR. EINHORN:  Mr. Hernandez, Daniel Hernandez.

3            THE COURT:  -- once represented --

4            MR. EINHORN:  My client.

5            THE COURT:  In what sort of matter?

6            MR. EINHORN:  He was his attorney in I believe three

7   criminal cases.

8            DEFENDANT JORDAN:  Yes, sir.

9            MR. EINHORN:  And one was taken to trial.

10           THE COURT:  And what did they relate to?  What were

11   the facts?  What were the charges?

12           MR. EINHORN:  If I can have just a brief second, your

13   Honor.

14           THE COURT:  Yes, take a moment.

15           (Mr. Einhorn conferring with Defendant Jordan)

16           MR. EINHORN:  Hence why we need to discuss it again,

17   your Honor.  So there was a reckless endangerment trial, and

18   Mr. Jordan was acquitted at that trial, and he was represented

19   by Mr. Lazzaro.  He said there were two other cases as well.

20   He could not remember the details of those cases.  I was

21   hopeful that by now we would have a little bit more information

22   so we could try and pull the records and at least get

23   something.

24           THE COURT:  Have you tried to pull the records?

25           MR. EINHORN:  We contacted the court for the

J1m1jonc

1    information but we didn't get it yet.  It's very difficult for

2    defense attorneys actually to get rap sheets for clients and

3    work backwards.  We get everything from the government usually.

4          THE COURT:  When did you first tell the government

5    about this potential conflict?

6          MR. EINHORN:  Only now, Judge.

7          THE COURT:  You mean only in front of me.

8          MR. EINHORN:  Only in front of you.

9          Your Honor, and just in realtime, I'm only hearing

10   about something now as well, and that's Mr. Lazzaro represented

11   another defendant in this case, Faheem Walter.

12          THE COURT:  Currently represents him on the state?

13          MR. EINHORN:  He's presently representing him on a

14   state case, your Honor.

15          THE COURT:  I'm sorry.  I'm confused.  Mr. Lazzaro

16   also represented who?

17          MR. EINHORN:  Faheem Walter, who is a defendant in

18   this case, and, at least according to my client, is still

19   representing him on a state case.

20          THE COURT:  What's that case about?

21          (Mr. Einhorn conferring with Defendant Jordan)

22          MR. EINHORN:  It's an assault case, your Honor,

23   related to a shooting.  I apologize.  That's all the

24   information I have at this point.

25          THE COURT:  All right.  Look, I appreciate your

J1m1jonc

1    bringing it to my attention, but if it isn't apparent, I'm less

2    than satisfied with the speed by which the government and I are

3    being told of this.  I mean, I've got a conference in this case

4    at 2:30.  For heaven's sake, I mean, you knew that I was

5    scheduling the *Curcio* hearing as to the issue here to get it

6    done before that conference.  You're sitting on this

7    information.  I'm glad you got to go out of state, but

8    meanwhile you've messed up this 2:30 conference.  We could have

9    either put over the conference or at least tried to gather

10    facts as to the *Curcio* to make sense of all this.

11         And have you spoken, for example, to Mr. Lazzaro about

12    the issue?

13         MR. EINHORN:  I have not yet.

14         THE COURT:  So in other words, except for talking to

15    your client and then going away for the long weekend, you've

16    done nothing.

17         MR. EINHORN:  I spoke with the client, I spoke with my

18    partner as well.  We discussed the matter.  We were both

19    hopeful we would get more information from Mr. Jordan as to the

20    details.  Doesn't sound like he remembered a lot more from then

21    to now.  We were hopeful he would so that there would be more

22    we could go forward with with regard to a *Curcio* hearing, your

23    Honor.

24         THE COURT:  All right.  Look, I will ask you to meet

25    with the government promptly after we adjourn today to give

J1m1jonc

<table>
<tr><td>1</td><td>them the benefit of everything you know.  Interview your client</td></tr>
</table>

1    them the benefit of everything you know.  Interview your client

2    as much as possible.  But as I understand it, really, it's

3    Mr. Walter and Mr. Jordan who were the clients in these prior

4    Lazzaro representations.

5              MR. EINHORN:  That's correct, your Honor.

6              THE COURT:  And so playing this out, I think I can

7    figure it out, but articulate for me the potential conflicts

8    presented by a Lazzaro representation in the past of your

9    client, let's say.

10             (Defendant Jordan conferring with his counsel)

11             MR. EINHORN:  Just generally, your Honor, for

12   instance, if my client were to testify and Mr. Lazzaro were to

13   examine my client in some way, he could use that information

14   against him.  My understanding is that there was a discussion

15   potentially that revolved around this case as well; without

16   getting into any details or breaking any confidentiality, that

17   there was a discussion about that.  Certainly that could be

18   used against my client as well.

19             THE COURT:  In terms of an issue for

20   cross-examination.

21             MR. EINHORN:  Correct.

22             THE COURT:  Okay.  And although I realize you're not

23   party to all this, same theory would presumably apply to

24   Mr. Walter, that there would be a concern that at trial there

25   would be some knowledge of the prior client that would inform

J1m1jonc

1    cross-examination.

2                MR. EINHORN:  That would be my understanding, your

3    Honor.  I don't represent Mr. Walter, of course.

4                THE COURT:  Yes, yes.  Do you understand that any of

5    the charges on which Mr. Lazzaro represented your client are

6    connected in any way to the charges or the organization that is

7    identified in the indictment?

8                MR. EINHORN:  Without revealing client confidences,

9    your Honor, I think that to be more clear, there was an inquiry

10   and a discussion with Mr. Lazzaro that would have been

11   connected after representation concluded in his final case.

12               THE COURT:  I'm sorry.  I don't follow what you're

13   saying.

14               MR. EINHORN:  Okay.  Mr. Lazzaro represented my

15   client, and then afterwards, there was a discussion concerning

16   something related to this case that occurred between my client

17   and Mr. Lazzaro.  So he didn't seek to retain him for that

18   case, but he had a longstanding relationship with this attorney

19   and then he contacted this attorney and there was a discussion.

20               THE COURT:  And your understanding is that the

21   discussion between your client and Mr. Lazzaro, even though it

22   wasn't in connection with a pending charge, somehow discussed

23   some of the conduct that is, let us say, alleged in the

24   indictment.

25               MR. EINHORN:  I don't know that I would want to say

J1m1jonc

1    conduct because that might be too specific, but certainly the

2    organization itself, the alleged organization.

3            THE COURT:  Right.  Okay.  Look, I will ask you to be

4    as transparent as you can with the government, consistent with

5    attorney-client privilege, so that they're in a position to

6    work through what are always a complicated set of issues, made

7    more complicated by our pending 2:30.  I suppose I will need to

8    put on the record at the 2:30 conference the fact that, as if

9    out of nowhere, a *Curcio* issue came up here and that I will be

10   asking government counsel and counsel for the affected

11   defendants to promptly confer about the right way to address

12   the *Curcio*.

13           MR. EINHORN:  Thank you, your Honor.

14           THE COURT:  Government, anything?

15           MR. LONGYEAR:  Just, Mr. Hernandez is also represented

16   by Ms. Dawn Florio, and I guess we should ask now if there are

17   any issues there as well.

18           THE COURT:  That's a nice question.  Is Ms. Florio, to

19   your knowledge, affiliated at the same firm as Mr. Lazzaro?

20           MR. LONGYEAR:  Not to the government's knowledge, your

21   Honor, no.

22           THE COURT:  Did Ms. Florio represent your client --

23           MR. EINHORN:  No, your Honor.

24           THE COURT:  -- Mr. Einhorn?

25           MR. EINHORN:  No, your Honor.

J1m1jonc

1          THE COURT:  And let's just have it out.  Ask your

2     client if Ms. Florio ever represented anyone else in this case.

3          MR. EINHORN:  He seems to know a lot.

4          (Mr. Einhorn conferring with Defendant Jordan)

5          MR. EINHORN:  No, your Honor.

6          THE COURT:  I think that's a very smart question the

7     government has identified, because in the hands of an

8     independent lawyer such as Florio, that helps some, but the

9     representation by Mr. Lazzaro obviously presents sort of

10    cross-examination issues with respect to Mr. Jordan that I

11    understand.

12         All right.  Government, you've got some thinking to do

13    as to how to sort out the swirl of issues here.

14         In any event, I'll see you all at 2:30.  Thank you,

15    all.

16         One moment.  Mr. Smallman, where is the 2:30?

17         THE DEPUTY CLERK:  318.

18         THE COURT:  Courtroom 318, not here.  All right.  See

19    you at courtroom 318.  Thank you.

20         THE DEPUTY CLERK:  All rise.

21                              o0o

22

23

24

25